Our fourth case for this morning is Shirlena Barnes v. City of Centralia and Michael Peebles. Mr. Ledbetter. Good morning, Your Honor. May it please the Court, my client is a 54-year-old African-American woman who has lived here her entire life in the small downstate community of Centralia, a community with a population of less than 13,000. She has worked for about two decades for the State of Illinois at Murray Developmental Center providing care to developmentally disabled individuals. She is well known throughout Centralia, including to the officers of the Centralia Police Department as they testified to during deposition. She has no history of arrest prior to this arrest on which this case is based, and no history of violence. Mr. Ledbetter, I'd like to focus in on the statement that was made, the word thirsty. Can you elaborate on that? Well, yes, Your Honor. I would characterize what my client, I believe, meant was that she believed Michael Peebles was overzealous. She said in her deposition transcript she meant hungry. I would characterize that as being overzealous. Officer Peebles testified what he thought she meant was that he was arresting people who shouldn't be arrested. So, in other words, overly aggressive in arresting individuals. Thank you. I wonder if you could focus on the question whether Officer Peebles, when he filled out the complaint, was acting under color of state law, or if you would like to direct our attention to anything else he might have done that was under color of state law. Your Honor, Officer Peebles testified that he became aware of my client's Facebook posts through the City of Centralia's Police Department Secretary, Connie Balentini, who was the individual who sent, texted, I should say, these relevant Facebook posts to Officer Peebles while he was driving home after he had just completed his shift. Officer Peebles did call Marion County Assistant State's Attorney, Melissa Duran, told Melissa Duran about the Facebook posts, indicated that he believed that my client had actually physically threatened harm to his children. Well, that's this sort of incomplete sentence where the Facebook post says that this so don't believe that what comes around goes around and when you've got kids of your own, period. So, it seems that it's that last phrase that caused Officer Peebles to think that there was some threat to his children. Yes, Your Honor, but I would say that Officer Peebles read things into the Facebook posts that weren't there. But that doesn't answer my question, which is, I mean, rightly or wrongly, maybe he grossly overreacted to it, but rightly or wrongly, you were starting to answer the question, what did he do that qualifies as, quote, under color of state law for purposes of 1983? Well, Your Honor, he talked to, he reported to the Police Department this alleged threat, talked to, in addition to talking to Assistant State's Attorney, Melissa Duran. But any private citizen could make a report to the Police Department. You don't have to be an officer. That is correct, Your Honor, but I believe that Officer James was influenced somewhat by Officer Peebles being a crony of his. It's a very small police department, fewer than 24 officers. What if Officer Peebles, instead of being a fellow police officer, had been the mayor of Centralia? I mean, it could be that Officer James sort of paid extra attention to that, too, right? That is correct, Your Honor. That is correct. All right, so he knew, but I'm not sure that, what Officer Peebles does is he fills out the, Officer Harvard comes over and takes his statement, right? Yes. Does he do anything else that causes this eventually dropped prosecution against your client? Well, Your Honor, Officer Peebles did make a statement that my client had yelled at him earlier that day the word, if I can truncate it, Mother Effer. During deposition, Officer Peebles testified that, no, he wasn't sure that it was my client that he heard yelling that while he was arresting Albert Gardner and Jovante Sims. Okay. Now, I realize part of your theory seems to be, and this seems also to be part of your Monell theory, that the city hasn't done an adequate job training its officers to realize that they just have to have a thick skin when it comes to obscenities. That's, I'm paraphrasing, but, you know, you can't arrest somebody just because they're yelling obscenities at you. Yes, and the reason that's part of the claim is because Officer James testified that part of the reason that Ms. Barnes was arrested was because she allegedly called Officer Peebles the Mother Effer word, and also, I believe that in one of his Facebook posts, Ms. Barnes referred to Officer Peebles as a B-I-T-C-H. But Officer James testified that he did not have, or a jury could reasonably conclude from Officer James's, the arresting officer's testimony, that he did not have adequate training to realize that yelling profanity at a police officer alone, alone, is within the confines of protected free speech. Right. No, that's certainly true, and alone wouldn't be enough for intimidation. But if this had been a more direct threat to his children, surely it would have satisfied the elements of the intimidation offense under Illinois law, right? Had there been a threat to his children, yes. I do not believe my client intended any threat to his children. Was this a public Facebook? Were there privacy settings on this Facebook account? Your Honor, there were not, but I would yet argue that the intention of my client was that these Facebook posts were to be read by her friends, and her not setting her Facebook page to be only viewable by her friends was not by design. So, I think there's, there may be an issue. You may be right, but it's a sad commentary on realism in the digital age, I guess. And with regard to the Facebook posts, this was an off-the-cuff remark. I do not believe my client meant to perhaps disparage Officer Peebles. She may have meant to insult him, to criticize him, but ultimately, as an officer, he is not beyond being criticized for what he does in his duties. And ultimately, I believe my client believes that Officer Peebles' demeanor may be overly aggressive with the public. He did testify at deposition that he had used the F word in dealing with the public. So, those sorts of behaviors certainly may be why my client has an issue with him. She also was frustrated at the crime. But it's still, you still haven't gotten beyond my first question. You know, Officer Peebles files a complaint. Any citizen could file a complaint. We have case law to say that is not an action under color of law. I think the question of probable cause to arrest in this case is a much closer one. Again, that's another alternate ground that the district court gave, because certainly if there had been probable cause, then both the federal and the state claims, I think, drop away. Maybe probable cause is thin, but there's a qualified immunity claim here as well, which takes us sort of one step back into arguable probable cause. So, but really fundamentally, linking it to him is what I'm having the most trouble doing. She's not suing Officer James, right? She is suing, but she is suing the city of Centralia. Well, that's a different theory, though. Yes. Yeah. But to establish a Section 1983 claim, if she can show that the city of Centralia had rights, then the city of Centralia may be liable for failure to train, failure to supervise, failure to discipline. Counsel, you indicated earlier how large this city was. How big is it? It's about 12,500 population. And how big is the police department? Fewer than 24 officers, I believe. I believe 23 officers presently. And the testimony is clearly these officers knew my client. Officer James testified. He had known her for years, talked with her on many occasions. He had known her to be helpful. He liked her. But I believe he was persuaded by Officer Peebles when Officer Peebles said, she threatened my children. A conclusory statement. The jury may clearly say, no, we don't believe, more likely than not, that this statement was a threat to his children. Okay. Well, if you want to save just a second for rebuttal. Yes. Yes. All right. Mr. Victor. May it please the Court, Your Honors. My name is Michael Victor. I represent the City of Centralia and Officer Michael Peebles. The Seventh Circuit and this Court should affirm the order of the District Court granting summary judgment for five separate reasons, summarized as follows. First, the District Court correctly held that Officer Peebles was not acting under a cover of law at the time of this incident. Would that argument dispose of the state malicious prosecution claim that's here before us on supplemental jurisdiction? That argument would not completely dispose of the state law malicious prosecution. Okay. But it would address all the 1983-based arguments. That's exactly right, Your Honor. If this Court holds and agrees with the District Court that Officer Peebles was not acting under a cover of law, that would be dispositive of Counts 1 and 2, which are both Fourth Amendment claims. And plaintiffs cannot satisfy that hurdle. And the reason is because Officer Peebles was acting within the realm of what a private citizen would do if that citizen felt that he or she was a victim of a crime. The sequence of events started with Officer Peebles arresting two members of a violent gang called the Rude Boys. Later that day, there's a Facebook post. It suggests a threat towards Officer Peebles. At least he felt like that. And he goes forward, and he eventually has a conversation with another officer from his department. Does the predicate matter at all? I mean, the ordinary citizen isn't going to have a chat with a different police officer and then another chat with an assistant state's attorney before filing a complaint. Does that make any difference in your view? It does not. And I would say that an ordinary citizen can reach out to a state's attorney, as long as that particular governmental entity has that contact information. Many do. And likewise, an ordinary citizen can call the police department and report that they are concerned about a threat. The important analysis here is what Officer Peebles did and comparing that to what other state actors did. Here there's a clear separation. Officer Peebles gave his statement to Officer James. Officer James then decided to conduct an investigation, which included sending another officer to Officer Peebles' house off-duty and taking his statement. That's where Officer Peebles' conduct stopped. And there's no other evidence that he did anything else, and there's certainly no evidence that he worked in concert or is part of the course of action that ultimately led to plaintiff's arrest. He sort of disappears from the story, actually, at this point, doesn't he? He does, Your Honor. And what I would say clearly established this delineation of events is Officer James then goes back and talks to the state's attorney, just like an officer might do if they had received a complaint from a private citizen. Officer James is the one who's verifying the veracity of everything. He is not a defendant in this lawsuit, and he is the one who did the investigation and the arrest. And that actually leads me to my second point, Your Honor. Officer Peebles had no personal involvement in the underlying constitutional violation that's alleged. Again, what plaintiff is bringing claims for is Fourth Amendment claims, in other words, illegal seizure claims. Officer Peebles was not involved in the seizure. He was not involved in the arrest. And making a complaint about being a potential victim of a crime does not constitute a seizure. We do not have, according to the case law, vicarious liability under Section 1983. And so for that basis, this court can also affirm summary judgment as to the federal claims. I'd like to move you ahead to the probable cause question. Does the fact that the state's attorney entered an order eventually ending the prosecution affect that claim? It does not, Your Honor. Why not? The reason is because the standard looks at what a reasonable officer in the position of Sergeant James at the time of the arrest knew. The fact that a state's attorney later on decided for whatever reason that those charges would not continue does not vitiate the probable cause that existed at the time of the arrest. But where is the probable cause that Ms. Barnes has committed intimidation? It's very thin. Although, as I say, a lot of the facts that you point to repeatedly in your brief don't seem to add or subtract. I mean, yes, the Rude Boys is a violent gang and so on. And maybe some other member of her family went and retrieved the motorbike. And then we get vaguer and vaguer about some connection with the house. But she's not arrested for that. I mean, it's the intimidation offense. And even the state's attorney isn't willing to say, sure, you've got probable cause. The state's attorney says it's dicey. So I'm not sure about probable cause here, which, again, for 1983 probably doesn't matter. For state malicious prosecution, it may matter. But on the other hand, on the state malicious prosecution claim, I wonder what you have to say about whether a complaining witness can count under Illinois law as the one who commences or continues the criminal action. To your last point, Your Honor, a complaining witness can be responsible under state law malicious prosecution. However, as related to this third point, probable cause is likewise a bar to such a claim in addition to being a bar to the federal claim. No, I know that. But if I were to think that the best you had was arguable probable cause, let's say, for instance, for qualified immunity purposes, that doesn't help in the state claim. So I'm looking then at the other elements. Certainly she can show that the state charges were terminated in her favor. If I put a question mark over probable cause, I don't want to rely on that. And you're saying that as a complaining witness, she's the kind of person who can be pursued. What about malice? What evidence is there in the record of malice on the part of Officer Peebles? I don't think there is any evidence of malice, because if you actually examine what Officer Peebles did, he made a complaint because he felt that the Facebook post was a threat to his family. And I think it can reasonably be construed by an objective officer in the position of either Peebles or James as indeed a threat. Regarding the issue of probable cause, I think in this case there's strong probable cause. And that's when considering the standard. Probable cause for what? I mean, to arrest Barnes for what? For both intimidation and aggravated intimidation. All right. So for intimidation and aggravated intimidation, we've got to show that she issued a threat. I mean, obviously aggravated, he's a police officer, fine. To inflict physical harm on somebody. I suppose that would be if you could read the statement about the children. I don't see what else there is. There's a bunch of factors that suggest that this was a credible threat. She has a very vague association with the house with which somebody else may be associated with this gang. She did show up at the scene of the arrest of two rude boys. That gang had put out threats. Why is that bad? I mean, I'm thinking of all sorts of Supreme Court decisions. So she's on the scene? So anybody who drives by and says, oh, something's going on, you know, is going to be arrested? Well, I think the constellation of events that can connect the dots as to this being a credible threat is time as it relates to the Facebook post. So Officer Peebles shows up to arrest. The plaintiff is undisputedly there. Later on, in very shortened time. And she's angry. I mean, she's undisputedly shouting obscenities at him. So very close time in proximity to that event, she makes the threat, or the Facebook post. And then the final dot to connect here is that Officer Peebles was the go-to person about the rude boys. The rude boys had put out threats to him. But she knows that? Well, she knows the rude boys. And if she knows the rude boys, she can effectuate the threat towards Officer Peebles and his family. And certainly when considering the probable cause standard, it's a low bar. But it's not a nothing bar. I mean, it is, in fact, it's above reasonable suspicion, for example. So we have a standard in the law that's weaker that still has some meaning. Yes, Your Honor. I mean, it is a bar. But it's a bar that was met here because of the whole group of facts when viewed as the entire picture. He alleged that she called his home frequently, right? Yes. And that he knew where they lived and worked and where her children were, right? That's true, Your Honor. Thank you for your time. All right, thank you very much. Anything further, Mr. Ledbetter? Your Honor, Officer Peebles did testify that he not only reported information to the City of Centralia Police Department, but he did testify unequivocally he was trying to get Charlene Barnes arrested, and he unequivocally testified he was trying to get her prosecuted. So I believe he went beyond simply reporting information. Well, what about the statements I just asked your opposing counsel, that she repeatedly called his home and office and made threats and knew where his children were and so forth? I'm not sure what the source of those statements are. Your statements with regard to trying to get her arrested and prosecuted, those are statements in his deposition? It is deposition testimony, yes. I'm not familiar with those statements. And I would say that Officer Peebles did. Well, if she called his home a lot, you'd still need some testimony from someone about what the content of those calls was. I don't have any knowledge that she had called his home. But as far as what Officer Peebles also potentially did beyond just reporting facts to the City of Centralia Police Department, it is disputed that my client, and he in his deposition testimony said he was not sure, actually, that it was my client yelling at him the mother-effer word. Now, initially in his sworn statement, he said my client yelled that to him earlier that day, that afternoon of the arrest. My client was driving home from work, saw two individuals being arrested, Albert Gardner, Jovante Sims, stopped to look to see what was going on. And Officer Peebles, she had two individuals in the car, her daughter, her niece. My client denies anybody in her car yelled, bald-headed mother-effer at Officer Peebles and believes that it was actually one of these boys' grandmothers who was yelling at Officer Peebles. Officer Peebles testified he really wasn't paying close attention to who was yelling at him. He was focusing on the people he was arresting. So, it is a disputed fact that my client yelled bald-headed mother-effer ever at Officer Peebles and as far as calling his home or threatening at all, that's clearly disputed. I don't see that on the list that the state has provided, or the city has provided on page 9 of its brief, but we'll look into it. I think we're going to have to. I have no knowledge of those statements. Counsel, that language I just quoted, some of it came from another case, so you're right, it was not. Yes, I had no knowledge of that whatsoever. And ultimately, if my client cannot prevail on the color of state law claims, I still believe she has shown what she needs to show, that the summary judgment should be reversed on the state law claim. Officer Peebles said clearly he was trying to get her arrested, and certainly his demeanor during the deposition was a little bit malicious, I would say, toward my client. Yeah, he was trying to get her arrested, he was trying to get her prosecuted, and I would argue he did just that. And he called the assistant state's attorney, and the assistant state's attorney texted Officer James. Okay. Okay, we're going to have to stop now. Thank you. Thank you very much. Thanks to both counsel, we'll take the case under advisement.